UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ELI ILANO, et al. <br><br> Defendants. | Case No. 16-cv-02322-VC <br><br> **SUMMARY JUDGMENT ORDER** <br><br> Re: Dkt. Nos. 25, 28, 30 |

      This lawsuit involves a challenge to a decision by the Forest Service to move forward with a plan to combat disease and beetle infestation in portions of the Tahoe National Forest. That challenge is rejected, because the Forest Service complied with the law in adopting the plan. The Service properly examined the plan's potential effect on the California spotted owl, and its conclusion that the species would likely benefit in the long run even if individual owls might experience limited effects in the short-run was adequately supported.

**I**

      As part of the 2014 Farm Bill, Congress amended an earlier law, the Healthy Forests Restoration Act, to address "[t]he outbreak of the pine bark beetle afflicting states across the nation . . . ." H.R. Rep. No. 13-333, at 512 (2014) (conf. report); *see* Agricultural Act of 2014, Pub. L. No. 113-79, § 8204, 128 Stat. 649, 915-18. The previous "system for managing national forests affected by historic insect infestations ha[d] not been responsive to the speed and widespread impact of the infestations." H.R. Rep. No. 13-333, at 512. The law was intended "to give forest managers greater opportunity to identify and manage risk in the forest." S. Rep. No.

113-88, at 18 (2013). Congress created a two-step process for approving projects to counter insect infestations and diseased forests: The first step is the designation of large swaths of forest – referred to as "landscape-scale areas" – facing a heightened risk of the harms from infestation and disease. 16 U.S.C. § 6591a. The second step is the approval of treatment projects within the landscape-scale areas. *Id.* § 6591b. To encourage speedy remediation, Congress explained that these projects "may be . . . considered an action categorically excluded from the requirements of [The National Environmental Policy Act of 1969 ("NEPA")]" so long as they meet a list of requirements about the purpose of the project, consultation, and scope. *Id.* § 6591b(a). This means that projects under this section may be exempted from the sometimes-lengthy process of preparing the environmental assessment or environmental impact statement typically required under NEPA in comparable situations.

In November 2015, Thomas Tidwell, the Forest Service Chief, designated 5.3 million acres of National Forest System land in California as landscape-scale areas where insect and disease treatment was needed to improve forest health. A.R. 3696, 3707.[1] In January 2016, the Forest Service initiated formal planning for the Sunny South Insect Treatment Project in the Tahoe National Forest, which fell within the landscape-scale areas designated in 2015. A.R. 1639. The project aims to thin stands of trees, remove dead and dying beetle-infested trees, and use prescribed burns to reduce the risk of insect or disease infestation and wildfire in parts of the forest. A.R. 6. It involves 2,700 acres of treatments. A.R. 7.

In June 2016, biologists from the Forest Service completed an evaluation of wildlife that might be affected by the Sunny South Project. A.R. 104. As part of that evaluation, the biologists assessed the potential effects of the proposed project on the California spotted owl, a species listed as sensitive in the Tahoe National Forest. A.R. 131-150. The evaluation surveyed the literature on the spotted owl. A.R. 131-136. It described the current presence of the owl in the proposed project area. A.R. 136-141. And it considered the potential direct and indirect

---

[1] "A.R." citations refer to the bates-stamped administrative record for the Sunny South Project filed in this case.

effects of the proposed project on the owl and its habitat. A.R. 141-150. The evaluation concluded that the project "may affect individuals, but is not likely to result in a trend toward federal listing or loss of viability for the California spotted owl." A.R. 150.

On August 3, 2016, the Administrator of the Tahoe National Forest approved the Sunny South Project. A.R. 7. The "decision memo" approving the project concluded that the categorical exclusion from NEPA review under the Farm Bill was applicable to the Sunny South Project. A.R. 22-24. The decision memo also considered whether there were "extraordinary circumstances" that would preclude the use of a categorical exclusion, and concluded that no extraordinary circumstances existed, including with respect to the project's impact on the spotted owl. A.R. 15. The decision memo explained how the design of the project would minimize the effects on the species. A.R. 14, 17. It concluded, as the biological evaluation had done, that the project "may affect individual owls, but is not likely to result in a trend toward federal listing or a loss of viability." A.R. 17.

The Center for Biological Diversity has now sued. It challenges the larger decision by the Forest Service in 2015 to designate the 5.3 million acres in California as landscape-scale areas, contending that the Forest Service was required to conduct a NEPA analysis before making that designation. It also challenges the decision to go forward with the 2,700-acre Sunny South Project, arguing that a NEPA analysis was at least required at this stage and that the use of a categorical exclusion from NEPA review was impermissible because of the potential harms to the spotted owl. Sierra Pacific Industries, a contractor for the Sunny South Project, intervened to defend the project decision. Dkt. Nos. 14, 17. The parties filed cross-motions for summary judgment. Dkt. Nos. 25, 28, 30.[2]

The parties agree that the standard of review set out in the Administrative Procedure Act applies in this case. Under the Administrative Procedure Act, a court "shall . . . hold unlawful

---

[2] The Center for Biological Diversity has standing to pursue this challenge through its member, Chad Hanson, who submitted a declaration about his interest in the dispute. *See Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc.*, 528 U.S. 167, 180-81 (2000); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 562-63 (1992).

and set aside agency actions, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] without observance of procedure required by law . . . ." 5 U.S.C. § 706(2).

## II

The application of NEPA to any particular circumstance is a matter of what Congress has said about its application. *See* 36 C.F.R. § 220.4(a)(4). There are at least two reasons to believe that Congress did not intend NEPA's review requirements to apply to an area designation made pursuant to the Farm Bill.

First, the area designation has only potential or contingent effects on the environment, to which NEPA does not apply. *See* 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. § 1508.8; *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004); A.R. 3786. The area designation "does not establish any goals, standards, or guidelines for the area . . . ." A.R. 3786. Approval of the landscape-scale areas says nothing about the projects that will be conducted within those areas. *Id.*; *see* A.R. 3696 ("Designation under Section 602 will allow us to further evaluate these landscape areas for potential treatments . . . ."). The decision whether to undertake projects is contingent, since the Forest Service "may carry out priority projects" in the designated areas. 16 U.S.C. § 6591a(d)(1). The designation merely makes any disease mitigation projects within the area potentially eligible for completion without a NEPA analysis and, even then, only if the requirements for a categorical exclusion are met. *See* Part II, *infra*; *Dep't of Transp.*, 541 U.S. at 767-68 (discussing a "rule of reason" for NEPA applicability based on the usefulness of information); *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007). Projects will necessarily be very small in comparison with the size of the area designation. The 2015 area designation in California was approximately 5.3 million acres, while the maximum size of any treatment project is 3,000 acres. 16 U.S.C. § 65891b(c)(1); A.R. 3696, 3707. Even more so than the disease management plan at issue in *Northcoast Environmental Center v. Glickman*, the area designation did "not create activities which impact the physical environment." 136 F.3d 660, 669-70 (9th Cir. 1998). The upshot of all of these eventualities is that any potential effects of the

area designation cannot be meaningfully evaluated. *See* 36 C.F.R. § 220.4(a)(3).

Second, Congress clearly intended to create an expedited process for insect and disease treatment, which is in tension with inferring a requirement for NEPA review of an area designation. The previous system for addressing insect and disease infestation was not sufficiently responsive, and the Farm Bill was supposed to create a streamlined process. H.R. Rep. No. 13-333, at 512; *see also* p. 1, *supra*. The resulting provisions emphasize the speed of area designations. The law required initial area designations within 60 days of the Farm Bill's enactment, upon a request by the governor of a state. 16 U.S.C. § 6591a(b)(1).[3] The Farm Bill lists the three bases for a designation. *Id.* § 6591a(c). A landscape-scale area designated under the Farm Bill must be

> (1) experiencing declining forest health, based on annual forest health surveys conducted by the Secretary;
> (2) at risk of experiencing substantially increased tree mortality over the next 15 years due to insect or disease infestation, based on the most recent National Insect and Disease Risk Map published by the Forest Service; or
> (3) in an area in which the risk of hazard trees poses an imminent risk to public infrastructure, health, or safety.

*Id.* All three bases for a designation invoke urgency. The projects within an area designation are described as "priority projects." *Id.* § 6591a(d)(1). Requiring NEPA analysis of area designations "would resurrect the very problems that Congress sought to eliminate" by creating the two-step process for insect and disease treatment projects. *Cal. Save Our Streams Council, Inc. v. Yeutter*, 887 F.2d 908, 912 (9th Cir. 1989). It is implausible "that Congress would involuntarily create a glaring loophole that would undermine the efficacy of the expedited process it adopted." *Id.*

There are some surface-level similarities between this case and *California Wilderness Coalition v. United States Department of Energy*, which held that NEPA review was required for

---

[3] The administrative record contains letters of support by public officials for expedited area designations in California. *See, e.g.*, A.R. 3699 (letter of support from Governor Brown explaining that "it is essential to immediately reduce risks from widespread tree mortality"); A.R. 3704 (letter of support to the Forest Service from the California Natural Resources Agency).

5

the designation of "national interest electric transmission corridors," areas within which electrical transmission lines could be approved by the Federal Energy Regulatory Commission, under the Energy Policy Act of 2005. 631 F.3d 1072, 1098-1103 (9th Cir. 2011). Like the area designations for insect and disease treatment, the designation of corridors in *California Wilderness Coalition* did not identify precisely where the project – the placement of electrical transmission lines – would occur. But there are important differences between application of the Energy Policy Act in *California Wilderness Coalition* and application of the Farm Bill in this case. Most importantly, the Energy Policy Act expressly left all NEPA requirements intact, except where otherwise noted. 16 U.S.C. § 824p(j)(1). By contrast, as discussed further below, Congress created a categorical exclusion from NEPA review for projects within an area designation. 16 U.S.C. § 6591a; *see Public Citizen*, 541 U.S. at 767. And the Ninth Circuit found the decision of where to place national interest electric transmission corridors to be a final agency action in part because it concludes the agency's responsibilities. *Cal. Wilderness Coal.*, 631 F.3d at 1100. By contrast, an area designation is a preliminary step for the Forest Service before potentially implementing treatment projects. 16 U.S.C. §§ 6591a, 6591b. Finally, the Energy Policy Act provisions about the creation of national interest electric transmission corridors do not suggest an intention to create an expedited process, while Congress clearly intended the Farm Bill to create an expedited designation process for areas needing insect and disease treatment.

In short, the Farm Bill embodies a congressional intent not to subject area designations to NEPA analysis. Congress can specify a requirement for environmental assessments and environmental impact reports when it wants to. *See* 16 U.S.C. § 824p(j)(1); *Cal. Wilderness Coal.*, 631 F.3d at 1103-05. It did not do so, and did not intend to do so, with respect to area designations. Accordingly, the Forest Service's designation of the 5.3 million acres without conducting a NEPA analysis was not contrary to law within the meaning of the Administrative Procedure Act.

## III

The Center for Biological Diversity next challenges the decision to approve the Sunny South Project on the ground that "extraordinary circumstances" precluded the Forest Service from avoiding NEPA review for the project. Before approving a project under an agency-adopted categorical exclusion from NEPA, an agency must examine whether a particular project presents "extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4. The Sunny South Project was approved under the categorical exclusion established by the Farm Bill for forest treatments conducted within designated treatment areas.

As a preliminary matter, the Forest Service contends it was not required to analyze whether extraordinary circumstances necessitated NEPA review for the Sunny South Project. This argument seems in tension with the language of the Farm Bill, which states: "a project . . . that is conducted in accordance with [the designation of an insect infestation and disease treatment area under] section 6591a(d) . . . may be considered an action categorically excluded from [NEPA]." 16 U.S.C. § 6591b(a)(1). This provision does not say that projects within an area designation "are" or "shall be" categorically excluded; it says that the Forest Service "may" exclude projects. This is in contrast to other parts of the statute that use the word "shall." *See, e.g.*, *id.* §§ 6591a(c), 6591a(d)(3), 6591b(c)(2), 6591b(c)(3). Therefore, the statute seems to say that the Forest Service must decide when to categorically exclude a project. The most obvious way for the Forest Service to decide whether to categorically exclude a project from NEPA review is to use the extraordinary circumstances analysis. Perhaps that's why the Forest Service actually included an extraordinary circumstances analysis in its decision memo on the Sunny South Project. A.R. 15-20. Since the Forest Service appeared to believe, at the time it considered the project, that extraordinary circumstances review was required, and since it in fact conducted that review, and since it seems like the law requires such review, this ruling will assume for purposes of analysis that such review was indeed required, notwithstanding the argument to the contrary that the Forest Service now makes in this litigation.

The decision memo approving the Sunny South Project concluded that no extraordinary circumstances existed with respect to the spotted owl that would make the use of the categorical exclusion under section 6591b inappropriate. A.R. 17. The Center for Biological Diversity contends that extraordinary circumstances do indeed exist, arguing that the Sunny South Project will reduce the tree canopy in the owl's "Home Range Core Areas," areas used by the owls in roosting or foraging for food, and may otherwise disturb or harm the spotted owls. A.R. 143-144.

To determine whether extraordinary circumstances exist, an agency must first evaluate whether certain natural resources, such as a sensitive species, are present in the project area. 36 C.F.R. § 220.6(b)(1). If those resources are present, the agency must assess "the degree of the potential effect of the proposed action on these resource conditions." *Id.* § 220.6(b)(2). If a sensitive species is present in the project area, the agency "must adequately explain its decision" if it wants to forgo preparing an environmental assessment or environmental impact statement. *Alaska Ctr. for Environment v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999); *see also California v. Norton*, 311 F.3d 1162, 1177 (9th Cir. 2002). "[T]he Ninth Circuit has held that an agency may issue a categorical exclusion even where threatened or endangered species are present if the agency determines that the project will not impact negatively on the species." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996) (citing *Pyramid Lake Paiute Tribe v. U.S. Dep't of Navy*, 898 F.2d 1410, 1414-16, 1420 (9th Cir. 1990)).

The decision memo approving the Sunny South Project and the biological evaluation prepared as part of the approval process thoroughly considered the potential effects of the project on the spotted owl. The biological evaluation began by describing the existing environment and risks for the spotted owl, including a discussion of the available scientific literature. A.R. 131-136. It then described the current presence of the spotted owl in the forest area affected by the Sunny South Project. A.R. 136-141. And it considered the potential effects of the project on the spotted owl and its habitat, including even unlikely effects of the project. A.R. 141-150.

8

The decision memo and biological evaluation express some uncertainty about whether the project will have an effect on the spotted owl. But to the extent there might be some harm to the spotted owl, the decision memo does not find any likelihood of harm significant enough to rise to the level of an extraordinary circumstance. Specifically, the decision memo concluded, based on the biological evaluation, that the "Sunny South Project may affect individual owls, but is not likely to result in a trend toward federal listing or a loss of viability." A.R. 17; *see* A.R. 150 (corresponding conclusion of the Biological Evaluation). This uncertainty about individual owls is not enough to conclude that the finding of no extraordinary circumstances was arbitrary and capricious. *See Conservation Cong. v. U.S. Forest Serv.*, No. 2:12-cv-02416 WBS KJN, 2016 WL 1162676, at *3 (E.D. Cal. Mar. 24, 2016) ("[T]he Supplement makes clear that while the BA reported that the Tatham Project 'may affect, but is not likely to adversely affect' the northern spotted owl, the degree of potential effects on the species is low enough that a categorical exclusion is still appropriate.").

Significantly, the Forest Service took care to ensure that the most important parts of the spotted owl's habitat would not be disturbed by the project. No trees will be cut in the owls' protected activity centers, the 300 acres including a spotted owl's nesting tree. A.R. 17. When a new roosting site was discovered during the development of the project, the project's boundaries were redrawn to exclude the area around that site. A.R. 14. The project applies a limited operating period within a quarter-mile of spotted owl activity centers. A.R. 17, 116. And it limits the treatments applied to the owls' home range core areas. A.R. 7, 17.

This careful approach to the spotted owl is consistent with the Forest Service's overall handling of the decision to go forward with the plan. For example, the Service also considered whether the project was likely to affect the California red-legged frog. To address uncertainty about the effect on this species, the Service reduced the scope of the project to make sure it would have no substantial effect. The Administrator wrote:

> I considered the concerns expressed during collaboration and scoping about the California red-legged frog and during an onsite visit and discussion with USFWS on June 3, 2016. Concern was

> expressed about the potential effect of the proposed action in proximity to designated critical habitat for the California red-legged frog (federally listed as Threatened) in the Michigan Bluff area. Because the degree of the potential effect raises uncertainty over its significance, an extraordinary circumstance exists; therefore, the proposed fuels treatments in Michigan Bluff preclude the use of a categorical exclusion and warrant further analysis in an EA or an EIS. The decision was made to remove all Michigan Bluff units from the project and proceed with the remaining project using the current CE category.

A.R. 13-14 (citation omitted). This decision by the Forest Service suggests that this is not a case of an agency attempting to paper over the potential effects of a project on endangered, threatened, or sensitive species.

The Center for Biological Diversity primarily takes issue with the factual conclusions of the biological evaluation and decision memo, rather than the process for reaching them.[4] It argues that the Forest Service's conclusion about extraordinary circumstances is arbitrary and capricious because there are five owl home range core areas in the project area, and thinning of trees in these home range core areas has a high potential for affecting the owls' reproductive success. But the biological evaluation considered the project activities within the home range core areas in reaching its conclusions. *See, e.g.*, A.R. 142-145. Scientists might disagree about the decision memo's conclusion about the project's effects on the spotted owl, but it was supported by the Forest Service's careful explanation, as well as the evidence in the record.[5] At a

---

[4] The Center for Biological Diversity does point out that the scoping letter provided to the public did not mention the California spotted owl. *See* A.R. 1540-1549. But the letter did identify that the Forest Service planned to rely on the categorical exclusion under section 6591b, in part "because there [were] no anticipated extraordinary circumstances potentially having effects which may significantly affect the environment." A.R. 1545. And the fact that the spotted owl was not identified in the scoping letter did not hinder public participation. Many comments submitted by the public highlighted potential harm to the owl's habitat. *See* A.R. 549-634.

[5] Even if an environmental assessment were required, this is one of the rare circumstances in which vacatur of the agency's decision would nonetheless be unwarranted. *See Nat'l Wildlife Federation v. Espy*, 45 F.3d 1337, 1343 (9th Cir. 1995). "Whether agency action should be vacated depends on how serious the agency's errors are 'and the disruptive consequences of an interim change that may itself be changed.'" *Cal. Communities Against Toxics v. U.S. Environmental Protection Agency*, 688 F.3d 989, 992 (9th Cir. 2012) (quoting *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)). In this case, the record suggests that any error in finding no extraordinary circumstances was mitigated by the agency's care in reaching that finding. *See* A.R. 14, 17-18. The depth of the extraordinary circumstances analysis resembled the investigation that the Forest Service would undertake for an environmental assessment. The biological evaluation reflects a detailed literature review and

minimum, it was not arbitrary or capricious.

\* \* \*

Because no NEPA review was required for the area designation, and because the extraordinary circumstances analysis of the effects of the Sunny South Project on the California spotted owl was adequate, summary judgment is granted to the defendants. The Court will enter judgment.

**IT IS SO ORDERED.**

Dated: August 16, 2017

VINCE CHHABRIA
United States District Judge

---

analysis of the project. A.R. 131-141. And, like an environmental assessment, the evaluation considered different sources and degrees of uncertainty for direct and indirect effects. A.R. 141-150.